Tilghm an C. J.
(Briefly stated the facts and then proceeded.) The defendant demurred to the plaintiff’s evidence, consequently every inference which might have been drawn- by the jury from the evidence, must now be drawn by the Court. There is no difficulty about the facts. The evidence is short and simple. The information received from the Dutch boats was, that Amsterdam, was not blockaded and *314 might be entered without danger from British cruisers. ' This is the whole of it, and there is no ground to infer any other information. The question is then, whether on that information the captain of the Resort was warranted, under the terms of the policy, in altering his course and proceeding towards the Texel. The policy requires information, that the port of Amsterdam might be entered with safety. To enter with safety it would seem necessary that there should be no danger from any belligerent nation. It was immaterial to the insurers from what quarter the danger arose, whether from British blockading squadrons or French cruisers ; nor do the words of the policy contain any distinction or any limitation as to the nations from whigh danger was apprehended. Indeed if we consider the political situation of' tile" United States at the time this insurance was effected, we cannot help supposing that danger was apprehended from France as well as from England. Mr. Er shine’s treaty had been made not long before, but it was uncertain whether it would be ratified by the British government. The probability was that it would be ratified, and if ratified there would be no danger from that quarter. But as the ratification was uncertain, it must be supposed that danger was apprehended from Great Britain. At the same time it must be confessed, that a prudent underwriter would apprehend danger from France also, and from Holland who was subject to France; because if the treaty had been ratified it would naturally have excited such resentment' in the emperor Napoleon as would have led to an immediate seizure and confiscation of all American property. This 'was an event so probable, that had it not been .for the waXTanty against seizui'e in port, I.should have supposed that the policy was intended to guax'd principally against danger of that kind. In case of French hostility, however, there would have been danger not only in port, but ixx approaching the port. And this was proved by the event. The outward buoy near which the brig was captured is nine or ten miles without the entrance of the Texel roads. So that the French px’ivateers had taken a station which would enable them to seize all vessels approaching the Texel. But it is contended by the plaintiff’s counsel, that the captain of the Resort had a right to proceed to the limits of the Dutch tenfitory to procure Information. To this construction of the policy I cannot assent, because it defeats the object of the *315 parties, which was,.that the voyage to Bremen should not be departed from unless on reasonable assurance that it might be done with safety. For the. going to the verge of, .the Dutch territory in order to seek for information, whether you may safely enter, is exposing yourgelf to danger, in order to know whether you are safe. This never could have been intended by the underwriters, nor do the words of the policy express such an intent. The information was to be received on arrival on the Dutch coast. Now the captain of the Resort swears, that he was on the Dutch coast when he received the information from the two boats, and that on the receipt of that information he took pilots and s.tood for the, Tex el. But the information was not such as the policy called for. ■Consequently there was no right to proceed towards the Tex el, and.the.departure from .the course of the voyage to Bremen wag a deviation which discharged the insurers. This point being decided in favour of the defendants, it is unnecessary to consider, whether there has been any breach of the plaintiff’s warranty against seizure for illicit or prohibited trade. I am of opinion, that judgment should be entered for the defendants.
Yeates J.
The words of this pplicy must be taken' in their plain and natural sense ; But the commercial and political state of Europe and this country may, with propriety, be resorted to in aid of its true construction. The voyage was at and from Nezv Tork to Bremen, with liberty to enter “ a Dutch port, xvhen informed on arrival on that coast, that “ it coidd be done xvith safety.” The plaintiff gave a warranty against illicit or prohibited trade. The word safety is, general in its nature: It comprehends freedom from ganger, not only from the Dutch ports being blockaded, and from British cruisers, but likewise from French or Dutch decrees, which might operate on the vessel before or after her arrival into such port.
The French decrees of the 6th August, and 13th November, 180/, were well known in the United States, before the brig sailed from Nezv York, in the summer of 1809, although the general practice of that port may not have conformed to their provisions. It is also observable that the case of a blockaded port is provided for by,a special contract in the policy; and that the written warranty is made against seizure or detention in port.
*316 A demurrer to evidence admits not only those facts which are directly sworn to and stated on the record, but also all conclusions of fact to ..'hich the evidence is admissible, and to which it is properly relevant and applicable. • But I concur with the remarks of-the Chief Justice on the trial, that the information received by captain Burke -on the coast of Holland., is too explicit to admit- of any doubt. It tends to prove information that there was no danger from blockade or British ci-uisers, and no more. It has not the'least tendency to prove safety from. Dutch or French decrees which might eventually be called into action, injuriously to the property insured.
It has been contended, that the capture of the brig by<the French privateer, excused her captain from making inquiry, and that she was sent into Amsterdam against his will: But it is fully ascertained by his own oath, that he had previously taken a pilot on board to take hijm into the Texel, and that he came either into, or near, the Dutch territories before he was captured. If the brig had altered the track of her voyage to Bremen, her port of destination, by standing in for the Texel. it is wholly immaterial as to the purposes of deviation, whether she was captured in the open sea, the roadstead or the waters of Holland. The deviation became complete thereby. It was not justified by the terms of the policy which permitted the entry into a Dutch port, only in case of preceding information, that it could be done with safety; nor was there such necessity or reasonable cause of voluntary departure from the usual course of the voyage insured. The voyage was therefore determined, and the insurers were discharged from all responsibility.
Another ground of defence has been urged against the plaintiff’s recovery, that the trade in defect of a French certificate of origin, was illicit, and prohibited by the emperor Napoleon, under his decrees of the 6th August, and 13th November, 1807, and therefore within the terms of the plaintiff’s warranty. The determination of this point, in my idea, depends on the -fact, whether the captain of the brig was on the high sea, beyond the territories of Holland, or'within those territories then under the dominion of, and in a state of dependence on, France. The difference between the legal operation of these edicts on the ocean and in France or her dependencies, is'sufficiently obvious to my mind. But it is unnecessary to express a decided opinion on this part of the case, as the deviation from the voyage insured, forms 'an in *317 Surmountable bar to the plaintiff’s recovery. I shall content myself with remarking that, the present case is more unfavourable to the plaintiff^ on- equitable principles, from' the decrees being known in the United States when he entered into the warranty against illicit o,r prohibited trade.
I deeply lament the, difficulties and hardships to which tbe commerce of neutrals has been subjected by the British orders in council, and the French, Spanish, and Dutch ordinances, during the late European war. A conformity to those regulations, unwarrantable in the highest degree by tbe law of natiqns, so far as they respect fair neutral trade on the 'ocean, is often impracticable. Innumerable inconveniences and losses have resulted to our merchants from the usurpations of power by foreign kingdoms. Incidit in'Scyllam qui vult evitare Charybdem. These are evils beyond our power to remedy. We sit n,pt to determine on the justice or morality of the laws of foreign sovereignties: But it is our imperious dut)^ to decide with impartiality and firmness on all contracts which may come before us however incautiously or improvidently those agreements may be expressed.
My opinion is, that judgment be rendered for the defendants upon this demurrer.
Gibson J. wb'o was not upon the bench when the case wá's. argued, delivered no opinion.
Judgment for the defendants.